ROBERTS, Circuit Judge,
concurring in part and concurring in the judgment:
I agree with the majority that the district court erred in denying the United States’ motion to intervene. I also concur in the court’s judgment of dismissal, but I reach that result by a different path than the majority has taken. In my view, Section 1503 of the EWSAA includes the authority to make Section 1605(a)(7) of the FSIA — on its face a “provision of law that applies to countries that have supported terrorism” — inapplicable to Iraq, and the Presidential Determination of May 7, 2003 therefore ousted the federal courts of jurisdiction in cases that relied on that exception to Iraq’s sovereign immunity. I also conclude that this ouster of jurisdiction is properly applied to pending cases, and that the district court’s judgment should thus be vacated and the case dismissed for want of jurisdiction.
A. The Scope of Section 1503 of the EWSAA
1. The pertinent language of Section 1503 is straightforward, authorizing the President to make inapplicable to Iraq Section 620A of the Foreign Assistance Act of 1961 and “any other provision of law that applies to countries that have supported terrorism” (emphasis added). As this court recently observed, “the Supreme Court has consistently instructed that statutes written in broad, sweeping language should be given broad, sweeping application.” Consumer Elecs. Ass’n v. FCC, 347 F.3d 291, 298 (D.C.Cir.2003). “Any other provision” should be read to mean “any other provision,” not, as the majority would have it, “provisions that present obstacles to assistance and funding for the new Iraqi Government.” Ante at 51.
This is particularly true given that Congress knows how to use more limited language along the lines of the majority’s construction when it wants to. Congress *61 did just that in another appropriations statute enacted just two months prior to the EWSAA. In that statute, Congress declared that certain restrictions on funding to foreign countries should not be construed to restrict assistance to nongovernmental organizations in those countries, but provided that this easing of restrictions would not apply “with respect to section 620A of the Foreign Assistance Act of 1961 or any comparable provision of law prohibiting assistance to countries that support international terrorism.” Consolidated Appropriations Resolution, 2003, Pub. L. No. 108-7, Div. E, § 537(c)(1), 117 Stat. 11, 196 (Feb. 20, 2003) (emphases added). The EWSAA, of course, refers to the very same section of the Foreign Assistance Act but includes substantially broader language in its subsequent catchall phrase. This use of different language in two statutes so analogous in their form and content, enacted so close in time, suggests that the statutes differ in their meaning, and that the facially broader language was in fact intended to have the broader scope.
2. The majority notes that Section 1605(a)(7) of the FSIA already “specifically provides that when a country, once designated as a state sponsor of terrorism, is subsequently restored to good standing, that country is still amenable to suit for acts that took place prior to the restoration of its sovereign immunity.” Ante at 56. The majority then concludes that the general power conferred by Section 1503 of the EWSAA should not be read to authorize the President to restrike this previously-fixed balance between the interests of a newly non-terrorist state and those of victims of terrorism.
I respectfully disagree. The majority’s reading simply assumes that the balance Congress struck in 1996 was left untouched by the EWSAA. In 2003, however, Congress for the first time confronted the prospect that a friendly successor government would, in its infancy, be vulnerable under Section 1605(a)(7) to crushing liability for the actions of its renounced predecessor. See U.S. Dep’t of State, Patterns of Global Terrorism 1999, at 2 (April 2000) (noting that the list of state sponsors of terrorism had been unchanged since 1993); U.S. Dep’t of State, Patterns of Global Terrorism 2001, at 63 (May 2002) (listing the same states). Certainly there is no evidence indicating that, when it enacted Section 1605(a)(7), Congress contemplated that a successor government’s cessation of support for terrorism would come about under circumstances like those in Iraq. Given the broad language of the EWSAA and the circumstances surrounding its enactment, it is entirely, possible — and surely not “perplexing,” ante at 56 — that Congress in 2003 made an ad hoc decision to strike a different balance in favor of the new government of Iraq. The whole point of Section 1503 was to change existing rules to respond to new realities; it is not a compelling argument against a construction of the section to object that it would do just that.
3. The majority further finds that construing the EWSAA to authorize an ouster of jurisdiction over Iraq in Section 1605(a)(7) cases would be “bizarre” in light of the sunset provisions of Section 1503. Ante at 56. “[Ajbsent intervening events,” the majority states, “[Section] 1605(a)(7) would once again be available as a basis of jurisdiction after September 30, 2004.” Id. at 57. Given the range of possibilities contained in the majority’s careful caveat, the prediction itself is overwrought. As one member of Congress has explained, in relation to a different statute, “[s]unsetting laws does not mean repealing them. Laws would only expire if Congress failed to meet its responsibility to reexamine and *62 renew these statutes within a specified period of time.” S.Rep. No. 104-85, at 64 (1995) (statement of Sen. Grams).
One need look no further than the title of the EWSAA to discern its emergency nature; a sunset provision in such a statute is intended to buy time for fuller consideration of the issues, rather than to establish an immutable date for the statute’s presumed extinction. And it hardly needs saying that the sunset provision in Section 1503 applies not only to the proviso at issue in this case, but to ail of that section. If the majority’s prediction of abject congressional lassitude is accurate, the Iraq Sanctions Act of 1990 will itself return to full strength on September 30, 2004. Nothing in the ISA requires that Iraq be included on the State Department’s list of state sponsors of terrorism, so even an orderly de-listing of Iraq by the executive branch under the procedures of 22 U.S.C. § 2371(c) would not alter the ISA’s restrictions on assistance. In short, the occurrence of “intervening events” is far more likely than their absence.
4. I agree with the majority that this question of statutory interpretation is close, and I do not suggest that the EW-SAA is entirely unambiguous. But the plaintiffs err in their assumption that the government must somehow prove that Congress intended the statute’s broad terms to be construed broadly. See Appel-lees’ Br. at 25 (“There is no indication that the proviso [in Section 1503] was intended to be a broad tool of foreign policy involving a retroactive restoration of sovereign immunity”); cf. ante at 56 (“There is no reference in the legislative history [of Section 1503] to the FSIA in particular or to federal court jurisdiction in general.”). The burden is precisely the opposite: the party seeking to narrow the application of the statute must demonstrate that Congress intended something less than what the law on its face says. See, e.g., Harrison v. PPG Industries, 446 U.S. 578, 589, 100 S.Ct. 1889, 1896, 64 L.Ed.2d 525 (1980) (“[T]he phrase, ‘any other final action,’ in the absence of legislative history to the contrary, must be construed to mean exactly what it says”). And as this court has stated, “the plainer the language, the more convincing contrary legislative history must be.” Cole v. Harris, 571 F.2d 590, 597 (D.C.Cir.1977) (internal quotation marks and citation omitted).
Harrison in fact resembles this case in significant respects: the Court was interpreting an amendment to the Clean Air Act that provided for review, in the appropriate federal court of appeals, of “locally and regionally applicable actions” taken by the Environmental Protection Agency “under specifically enumerated provisions of the Act, and of ‘any other final action of the [EPA under the Act] ... which is locally or regionally applicable.’ ” 446 U.S. at 579,100 S.Ct. at 1891 (quoting 42 U.S.C. § 7607(b)(1) (1976 & Supp. II)) (emphasis and ellipsis in original). The respondents, citing the ejusdem generis canon of interpretation (the corollary noscitur a sociis was not then in vogue), urged the court to construe the phrase “any other final action” to mean only final actions similar to those specifically identified in the statute. Id. at 587, 100 S.Ct. at 1895. The Court refused, noting that the ejusdem generis canon should be applied only when the meaning of the text is uncertain and finding “no uncertainty in the meaning of the phrase, ‘any other final action.’ ” Id. at 588, 100 S.Ct. at 1895.
Significantly, the Court also rejected the respondents’ argument — based on the “scant” legislative history of the amendment — that it was “unlikely ... that Congress would have expanded so radically the jurisdiction of the courts of appeals, *63 and divested the district courts of jurisdiction, without some consideration and discussion of the matter.” Id. at 591, 592, 100 S.Ct. at 1897-98. “In ascertaining the meaning of a statute,” the Court stated, “a court cannot, in the manner of Sherlock Holmes, pursue the theory of the dog that did not bark.” Id. at 592, 100 S.Ct. at 1897-98. The Court concluded that the statutory language meant “exactly what it sa[id], namely, any other final action.” Id. at 589, 100 S.Ct. at 1896 (emphasis in original).
More recently, the Court unanimously rejected the suggestion that certain broad terms of the Federal Power Act (FPA) should be construed narrowly in light of Congress’s focused intent to overrule one of the Court’s prior cases: “[Ejven if [the prior case] catalyzed the enactment of the FPA, [it] does not define the outer limits of the statute’s coverage.” New York v. FERC, 535 U.S. 1, 21, 122 S.Ct. 1012, 1025, 152 L.Ed.2d 47 (2002). In my view, Harrison and New York illustrate the appropriate approach to a broadly worded statute such as Section 1503 of the EWSAA. The absence of any reference to the FSIA in the legislative history does not compel the conclusion that Section 1503 does not reach it, and the fact that Congress may have been focused primarily on removing barriers to the flow of aid to Iraq does not mean that the statute refers exclusively to such barriers. See PGA Tour, Inc. v. Martin, 532 U.S. 661, 689, 121 S.Ct. 1879, 1896-97, 149 L.Ed.2d 904 (2001) (“the fact that a statute can be applied in situations not expressly anticipated by Congress does not demonstrate ambiguity. It demonstrates breadth.”) (quoting Pennsylvania Dep’t of Carr. v. Yeskey, 524 U.S. 206, 212, 118 S.Ct. 1952, 1955-56, 141 L.Ed.2d 215 (1998)).[1]. Because the legislative history contains no “convincing” indication, Cole, 571 F.2d at 597, that Congress did not intend to include Section 1605(a)(7) of the FSIA among the “any other” provisions that the President could render inapplicable to Iraq, I conclude that the President was authorized to — and did, with the Presidential Determination — oust the federal courts of jurisdiction over Iraq in Section 1605(a)(7) cases.
5. I do not mean to suggest that the contrast between the language of the Consolidated Appropriations Resolution and that of the EWSAA is conclusive proof of Congress’s intent — but then neither is the majority’s 'invocation of the pre-existing balance struck in Section 1605(a)(7). I appreciate that my view of Congress’s purpose in restriking that balance is necessarily speculative — but then so is the majority’s more limited view of Congress’s purpose to reach only aid statutes. The majority can cite United States v. Morrow, 266 U.S. 531; 45 S.Ct. 173, 69 L.Ed. 425 (1925), for a presumption that supports its construction of the pertinent proviso, see ante at 52-53, 54 — but I can respond with a case of similar vintage for the opposite proposition that “a frequent use of the proviso in Federal legislation [is] to introduce ... new matter extending rather than limiting or explaining that which has gone before.” Interstate Commerce Comm’n v. Baird, 194 U.S. 25, 37, 24 S.Ct. 563, 566, 48 L.Ed. 860 (1904). And both I and the majority (and everyone else, for that matter) are on tenuous ground when it eomes to predicting whether Congress will act prior to the sunset date in Section 1503.[2]
*64 In such circumstances I prefer to rest on the firmer foundation of the statutory-language itself. Give me English words over Latin maxims. The words here— “any other provision of law that applies to countries that have supported terrorism” — are, even if not entirely unambiguous, plain enough to impose a heavy burden on those who would rely on canons, or structure, or assumed purposes to conclude the words do not reach a law that applies, by its terms, to a foreign state “designated as a state sponsor of terrorism.” 28 U.S.C. § 1605(a)(7)(A). The majority ably marshals the arguments on the other side, but at the end of the day I find greater solace in the words themselves. See Connecticut Nat’l Bank v. Germain, 503 U.S. 249, 253-54, 112 S.Ct. 1146, 1149-50, 117 L.Ed.2d 391 (1992) (“canons of construction are no more than rules of thumb that help courts determine the meaning of legislation, and in interpreting a statute a court should always turn first to one, cardinal canon before all others. We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there.”).[3]
B. Application to Pending Cases
The plaintiffs argue that even if Section 1503 is properly read to include an ouster of jurisdiction under the FSIA, applying the statute to pending cases such as this one would be impermissibly retroactive under Landgraf v. USI Film Products, 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994). This court reviewed the applicability of the Landgraf framework to jurisdictional statutes in LaFontant v. INS, 135 F.3d 158 (D.C.Cir.1998), and concluded that the pertinent question — assuming Congress had not explicitly addressed ret-roactivity — was whether the statute spoke to the power of the court or instead to the substantive rights of the parties. Retroactive application is permissible in the former case, but not the latter. Id. at 163.
We recently held that Section 1605(a)(7) of the FSIA is solely a jurisdictional provision that creates no cause of action and does not affect the substantive law deter *65 mining the liability of a foreign state. Cicippio-Puleo v. Islamic Republic of Iran, 353 F.3d 1024, 1033-34 (D.C.Cir.2004). Rendering Section 1605(a)(7) inapplicable, therefore, can only affect the power of the court and not the substantive rights of the parties. Application of the EWSAA to Section 1605(a)(7) is accordingly not im-permissibly retroactive with respect to pending cases.
Moreover, the concern animating the Supreme Court’s retroactivity jurisprudence is that “settled expectations should not be lightly disrupted.” Landgraf, 511 U.S. at 265, 114 S.Ct. at 1497 (footnote omitted). At the time of the primary conduct at issue here, the jurisdictional grant of Section 1605(a)(7) did not even exist. We now know that the cause of action plaintiffs invoke did not exist then or now. Cicippio, 353 F.3d at 1033-34; see ante at 58-60. Any claim plaintiffs could have brought was in any event always subject to compromise or abrogation by the Executive. See American Ins. Ass’n v. Garamendi, 539 U.S. 396, 123 S.Ct. 2374, 2386-87, 156 L.Ed.2d 376 (2003); Dames & Moore v. Regan, 453 U.S. 654, 686, 101 S.Ct. 2972, 2990, 69 L.Ed.2d 918 (1981). Under these circumstances, there is no impediment to application of the normal rule that provisions addressing the power of a court be given retroactive effect.
For the foregoing reasons, I would hold that Section 1503 of the EWSAA and the Presidential Determination deprived the courts of jurisdiction over suits against Iraq under Section 1605(a)(7), and that the new jurisdictional rule applies to pending cases, including this one. I therefore agree that the judgment of the district court should be vacated and the case dismissed.

. Application of the ejusdem generis canon seems particularly inappropriate in this case because the statute provides only one point of reference (Section 620A of the Foreign Assistance Act) from which to extrapolate.

. There is of course an established framework that governs judicial review of statutory inter *64 pretations by agencies in the executive branch. See Chevron USA Inc. v. Natural Res. Def. Council, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). In such circumstances, we defer to any reasonable construction adopted by the entity Congress has entrusted with administering the statute. Id. at 843-45, 104 S.Ct. at 2781-83. There is no doubt that the President's interpretation of Section 1503 to cover Section 1605(a)(7) is at least a reasonable one. The applicability of Chevron to presidential interpretations is apparently unsettled, see Chamber of Commerce of the United States v. Reich, 74 F.3d 1322, 1325 (D.C.Cir.1996); Note, Extending Chevron Deference to Presidential Interpretations of Ambiguities in Foreign Affairs and National Security Statutes Delegating Lawmaking Power to the President, 86 Cornell L. Rev. 411 (2001), but it is interesting to note that this would be an easy case had the EWSAA provided that, say, the Secretary of State may exercise the authority conferred under Section 1503. It is puzzling why the case should be so much harder when the authority is given to the Secretary’s boss.

. The plaintiffs argue that the grant of such authority to the President is unconstitutional in light of Clinton v. New York, 524 U.S. 417, 118 S.Ct. 2091, 141 L.Ed.2d 393 (1998), because such a grant would empower the President “to change the text of § 1605(a)(7) so that Iraq’s immunity no longer turns on its status at the time the act occurred” or to "repeal[] § 1605(a)(7) solely as it relates to Iraq." Appellees' Br. at 50. The actions authorized by the EWSAA are a far cry from the line-item veto at issue in Clinton, and are instead akin to the waivers that the President is routinely empowered to make in other areas, particularly in the realm of foreign affairs. See, e.g., 22 U.S.C. § 7207(a)(3) (authorizing the President to waive a statutory prohibition on assistance to certain countries if he determines that a waiver is in the national security interest).