**WELLS FARGO BANK,
N.A., Appellant,**

v.

**FEDERAL DEPOSIT INSURANCE
CORPORATION, Appellee.**

No. 01–5280.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 15, 2002.

Decided Nov. 15, 2002.

Mary Ellen Hennessy, pro hac vice, argued the cause for appellant. With her on the briefs was Gloria B. Solomon.

Lawrence H. Richmond, Counsel, FDIC, argued the cause for appellee. With him on the brief was Colleen J. Boles, Senior Counsel. Ann S. DuRoss, Assistant General Counsel, entered an appearance.

Before: EDWARDS, RANDOLPH and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge TATEL.

TATEL, Circuit Judge:

In this case, we must decide whether Federal Deposit Insurance Act requirements applicable to banks that acquire savings associations continue to apply when such banks are in turn acquired by other banks. The Federal Deposit Insurance Corporation, which is charged with enforcement of the statute, concluded that these "second generation" transactions are subject to the Act's restrictions. The district court agreed. Because we find the statute ambiguous on this issue and the FDIC's interpretation consistent with congressional purpose, we affirm.

I.

Following widespread failures of savings and loan associations in the 1980s, Congress restructured the federal depository insurance system in the Financial Institutions Reform, Recovery, and Enforcement Act of 1989. Pub.L. No. 101–73, 103 Stat. 183 (codified as amended in scattered sections of 12 U.S.C.). Known as FIRREA, the Act abolished the insolvent Federal Savings and Loan Insurance Corporation and shifted its responsibilities to the Federal Deposit Insurance Corporation. The Act also created an independent Bank Insurance Fund (known as BIF) to cover deposits of commercial banks and a Savings Association Insurance Fund (known as SAIF) to cover deposits of savings and loan associations. SAIF's premiums were significantly higher than BIF's because SAIF needed to build reserves and to cover additional thrift failures.

Because Congress worried that SAIF's capitalization could be jeopardized if healthy savings associations, in order to take advantage of BIF's lower premiums, converted to banks or transferred their deposits to banks, FIRREA also amended the Federal Deposit Insurance Act to impose entrance and exit fees on so-called

conversion transactions that effectively transfer deposits between BIF members and SAIF members. 12 U.S.C. § 1815(d)(2)(B), (E), (F). FIRREA also imposed a five-year moratorium (later extended to 1996) on such transactions. *Id.* § 1815(d)(2)(A)(ii).

One of the few exceptions to the moratorium and fees is contained in the so-called Oakar Amendment, which allows certain mergers and deposit transfers as long as participants' obtain regulatory approval and the acquiring institutions continue paying proportional assessments to BIF and SAIF. *Id.* § 1815(d)(3). If the acquiring bank is a BIF-insured institution (an "Oakar bank"), for instance, it pays BIF assessments on its original deposits and SAIF assessments on the "adjusted attributable deposit amount" (AADA)—the proportion of deposits obtained from savings associations, adjusted for subsequent growth. *Id.* § 1815(d)(3)(B)(i). The Oakar bank's AADA premiums are deposited in SAIF, and SAIF bears a proportional share of any costs incurred by the FDIC if the bank later fails. *Id.* § 1815(d)(3)(D)(i), (G).

In 1990, the FDIC issued an advisory opinion—the Rankin Letter—explaining how it would treat situations in which an Oakar bank merges with or is acquired by a normal BIF member. FDIC Advisory Op. No. 90–22 (June 15, 1990). Although nothing in FIRREA explicitly addresses this question, the FDIC said that it would consider such "second generation" or "downstream" purchases to be conversion transactions. Accordingly, the acquiring BIF member would be subject either to the moratorium and fee provisions or to the Oakar Amendment's proportional assessments rule. The FDIC later reaffirmed this position in a December 1996 rulemaking. 12 C.F.R. § 327.37; 61 Fed.Reg. 64,960, 64,962–64 (Dec. 10, 1996).

In April 1996, after the issuance of the Rankin Letter but before the 1996 regulations, appellant Wells Fargo, a BIF member, acquired and merged with First Interstate Bancorp and seven of its subsidiaries, including three Oakar banks that had acquired savings association deposits in prior transactions. Over the next several years, the FDIC assessed SAIF premiums on a portion of Wells Fargo's new deposits.

■ Arguing that its purchase of the Oakar banks was not a conversion transaction, Wells Fargo filed suit in the United States District Court for the District of Columbia seeking a $23 million refund of SAIF premiums and other charges that it had paid because a portion of its deposits were treated as being insured by SAIF. The district court, applying *Chevron*'s two-part analysis, *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984), found the statute silent as to the treatment of transactions between Oakar banks and normal BIF members and the FDIC's interpretation both reasonable and consistent with congressional intent. *Wells Fargo Bank, N.A. v. FDIC*, No. 00–1251, slip op. at 7, 9–12 (D.D.C. June 15, 2001). The court therefore granted the FDIC's motion to dismiss for failure to state a claim upon which relief can be granted. *Id.* at 12. Our review is de novo. *Cummings v. Dep't of the Navy*, 279 F.3d 1051, 1053 (D.C.Cir.2002).

## II.

■ We start our analysis, as always, by asking whether Congress has spoken to "the precise question at issue." *Chevron*, 467 U.S. at 842, 104 S.Ct. at 2781. If it has, both we and the agency must give effect to Congress's unambiguously expressed intent. *Id.* at 842–43, 104 S.Ct. at 2781–82. Because the judiciary functions as the final authority on issues of statutory

construction, "[a]n agency is given no deference at all on the question whether a statute is ambiguous." *Cajun Elec. Power Coop., Inc. v. FERC,* 924 F.2d 1132, 1136 (D.C.Cir.1991); *see also SBC Communications Inc. v. FCC,* 138 F.3d 410, 418 (D.C.Cir.1998) (stating that a court must determine whether a statute is ambiguous on its own, without regard to an agency's reasoning). We consider the provisions at issue in context, using traditional tools of statutory construction and legislative history. *Nat'l Rifle Ass'n of Am., Inc. v. Reno,* 216 F.3d 122, 127 (D.C.Cir.2000).

■ Under the Federal Deposit Insurance Act as amended by FIRREA, mergers or consolidations between two financial institutions are "conversion transactions" only if they involve a "Bank Insurance Fund member" on one side and a "Savings Association Insurance Fund member" on the other. 12 U.S.C. § 1815(d)(2)(B)(ii). The Act then defines these two terms: A "Bank Insurance Fund member" is "any depository institution the deposits of which are insured by the [BIF]," and a "Savings Association Insurance Fund member" is "any depository institution the deposits of which are insured by the [SAIF]." *Id.* § 1817(*l*)(4), (5). Wells Fargo, a BIF member, argues that the statute unambiguously says that Oakar banks (like the ones it acquired) are also BIF members and therefore that its acquisitions were not "conversion transactions." Disagreeing, the FDIC insists that Oakar banks must be treated as SAIF members for purposes of second generation transactions because financial institutions would otherwise be able to evade both proportional Oakar assessments and entrance and exit fees by transferring savings association deposits first to an Oakar bank and then to a normal BIF member.

■ We disagree with Wells Fargo that the statute is unambiguous with respect to "the precise question at issue": whether Oakar banks should be considered SAIF members for purposes of regulating downstream transactions. Not only has Wells Fargo identified nothing in either the statute or its legislative history suggesting that Congress even considered this issue, but section 1817(*l*)'s definitions do not prohibit institutions from being members of both funds simultaneously. According to Wells Fargo, section 1817(*l*) *implicitly* forbids dual membership because it uses mutually exclusive terms to determine institutions' fund membership at the time of enactment, *id.* § 1817(*l*)(3); *see also id.* § 1817(*l*)(1), (2) (establishing mutually exclusive membership rules for newly established financial institutions), but this argument ignores the fact that the Oakar Amendment *explicitly* allows institutions to take on a hybrid status after engaging in a conversion transaction with a member of the other fund. *Id.* § 1815(d)(3).

Moreover, nothing in the Oakar Amendment unambiguously resolves the issue of fund membership. Wells Fargo emphasizes that the Amendment states that an Oakar bank's AADA "shall be *treated as* deposits which are insured by the Savings Association Insurance Fund" for purposes of assessment, *id.* § 1815(d)(3)(B)(i) (emphasis added), not that its deposits actually are insured by SAIF. Yet the Act never defines the difference between being "treated as" and actually "insured by" SAIF, nor specifies whether such treatment should continue if an Oakar bank's AADA is transferred to another institution. Indeed, the statute appears to make no meaningful distinction between Oakar banks' relationships with BIF and SAIF. Such banks are "treated as" SAIF members for purposes of assessment since they must pay SAIF rates on their AADAs and since those premiums must be deposited in SAIF. *Id.* § 1815(d)(3)(D)(i). The statute

also treats them as SAIF members for purposes of loss allocation. Although Wells Fargo argues that another provision of the Federal Deposit Insurance Act indicates that BIF should make all initial payments to depositors in the event that an Oakar bank fails, *id.* § 1821(f)(1), SAIF must absorb the losses attributable to the bank's AADA if the institution's assets are insufficient to cover all FDIC payouts, *id.* § 1815(d)(3)(G).

Wells Fargo points to section 1815(d)(3)(E)(ii), which states that the Oakar Amendment "shall not be construed as authorizing transactions which result in the transfer of any insured depository institution's Federal deposit insurance from 1 Federal deposit insurance fund to the other Federal deposit insurance fund." Wells Fargo interprets this language to mean that a BIF member that acquires a savings association remains exclusively a BIF member, but we think it not so clear. The new financial institution that results from such a merger is in fact a hybrid, treated as a savings association with respect to its AADA and as a bank with respect to its original deposits. For core purposes of assessment and loss allocation, the Oakar Amendment mandates that the hybrid still be treated as a member of SAIF after the Oakar transaction, a result that comports with section 1815(d)(3)(E)(ii)'s statement that the institution's deposit insurance does not transfer between funds. Indeed, the Amendment specifically provides that Oakar banks may end their obligations to SAIF by paying the entrance and exit fees to transfer their AADAs to BIF after the moratorium's expiration. *Id.* § 1815(d)(3)(H).

Finally, FIRREA's legislative history is equally ambiguous on the membership status of Oakar banks. Although Wells Fargo emphasized at oral argument that the Senate's original version of the bill would have defined SAIF members as including "any other financial institution that is required to pay assessments into the [SAIF]," S. 774, 101st Cong. § 208(*l*)(4) (1989), that language could not have been intended to refer to Oakar banks because it was drafted before the Oakar Amendment was even proposed. The conference committee reports do not discuss why committee members did not adopt the Senate's membership definition nor what they thought about the fund membership of Oakar banks, H.R.Rep. No. 101–222, at 394–96 (1989); H.R.Rep. No. 101–209, at 396–98 (1989), but Amendment sponsor Rep. Mary Rose Oakar stated clearly that the hybrid institutions "will [still] be subject to the moratorium restrictions, the exit and entrance fee requirements and will not have left the SAIF system for purposes of the thrift acquired." 135 Cong. Rec. 18,556 (1989).

On balance, then, we think the Oakar Amendment is ambiguous on two counts: as to whether a hybrid Oakar bank is a "depository institution the deposits of which are insured by the Savings Association Insurance Fund" to the extent of its AADA, 12 U.S.C. § 1817(*l*)(5), and as to whether its adjusted attributable deposit amount should still be "treated as" insured by SAIF for purposes of assessment after a downstream transaction with another BIF member, *id.* § 1815(d)(3)(B)(i). Both of our sister circuits that have considered the issue agree that the statutory scheme is ambiguous. As the Eleventh Circuit explained:

> Under the statute, a BIF Oakar institution holds some funds that are in every meaningful way and effect insured by the SAIF, and it holds other funds that are in every meaningful way and effect insured by the BIF. The statute defines an SAIF member institution as one whose funds "are insured by the

[SAIF]," *id.* § 1817(*l*)(5), and it defines a BIF member institution as an institution whose funds "are insured by the [BIF]," *id.* § 1817(*l*)(4). Under these provisions and definitions, an Oakar institution can be a "member" of both funds. Thus, there is an ambiguity in the statute. *Bank of Am., N.A. v. FDIC,* 244 F.3d 1309, 1317 (11th Cir.2001); *see also Branch Banking & Trust Co. v. FDIC,* 172 F.3d 317, 326–27 (4th Cir.1999) (finding a conflict between the requirement that the AADA merely be treated as insured by SAIF and the Oakar Amendment's prohibition on transfers between funds).

### III.

 We next consider the FDIC's interpretation of the statute. Although both parties assume that *Chevron*'s second step governs this case, we doubt whether the FDIC is entitled to *Chevron* deference because, although it had issued the Rankin Letter at the time Wells Fargo acquired the three Oakar banks, it had not yet exercised its formal rulemaking authority—the 1996 regulation. *See United States v. Mead Corp.,* 533 U.S. 218, 229–34, 121 S.Ct. 2164, 2172–75, 150 L.Ed.2d 292 (2001); *Am. Fed'n of Gov't Employees v. Veneman,* 284 F.3d 125, 129 (D.C.Cir.2002) (agency action not intended to have force of law is not entitled to *Chevron* deference). At the very least, however, because the FDIC is charged with administering this highly detailed regulatory scheme, we may resort to its "body of experience and informed judgment" for guidance to the extent that its position is persuasive. *Skidmore v. Swift & Co.,* 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944).

 Congress restricted conversion transactions for an obvious reason: It wanted to ensure that assessments on savings association deposits would keep flowing into SAIF so that the fund would be properly capitalized. *See, e.g.,* H.R.REP. No. 101–54, Pt. 1, at 411–12 (1989) ("The Committee believes that this moratorium is necessary ... to provide for a stable and increased premium income to reduce the amount of taxpayer funds ultimately needed to resolve the crisis."). The Oakar Amendment not only furthered this goal, but also encouraged healthy banks to acquire ailing savings associations by ensuring that acquiring institutions unwilling to pay the steep entrance and exit fees to transfer deposits directly out of SAIF could instead accept a hybrid status and ongoing SAIF assessments. *See* 135 CONG. REC. 18,556 (1989) (statement of Rep. Oakar) (Oakar banks "will not have left the SAIF system for purposes of the thrift acquired"); *see also* 12 U.S.C. § 1815(d)(3)(H) (requiring Oakar institutions to pay entrance and exit fees after the expiration of the moratorium to end their obligations to pay proportional assessments).

As the FDIC pointed out in both its 1996 rulemaking and brief in this case, Wells Fargo's interpretation would frustrate Congress's stated purpose and would render the statutory scheme largely meaningless, since institutions could evade the entrance and exit fee payments and the continuing obligation to pay proportional assessments by structuring conversion transactions as two-step transfers—from a savings association to an Oakar bank and then to a normal BIF member. In contrast, the FDIC's interpretation "implements Congressional intent because it prevents financial institutions from manipulating the system at SAIF's expense. It is also consistent with the Oakar Amendment's requirement that an Oakar bank's deposits retain their original fund affiliation." Appellee's Br. at 31. Thus, treating downstream mergers between Oakar banks and normal BIF members as

conversion transactions is a reasonable—if not the most reasonable—interpretation of the statute. *See Bank of Am., N.A.,* 244 F.3d at 1322; *Branch Banking & Trust,* 172 F.3d at 328–29.

Wells Fargo makes three challenges to the reasonableness of the FDIC's interpretation. It argues that the agency's position is unwarranted because the facts alleged in the bank's complaint show that this merger did not involve a bad-faith attempt to evade SAIF assessments, amounts to a *post hoc* rationalization adopted for purposes of litigation, and conflicts with prior agency interpretations. None of these arguments is persuasive.

Congress was concerned with the effect of conversion transactions on SAIF's capitalization, not the parties' good or bad faith. Also, since 1990, the FDIC has held firm to its interpretation that second generation transactions should be treated as conversion transactions. Industry members' questioning of this interpretation at the time that the FDIC confirmed its earlier position in a formal rulemaking does not negate the fact that the agency made a considered decision on the issue. Otherwise, any rulemaking adopted in the face of comments challenging an agency's statutory interpretation would have to be discounted as a *post hoc* rationalization adopted in anticipation of potential litigation by disgruntled commenters.

In support of its claim that the FDIC's position in this case conflicts with earlier statements, Wells Fargo points to a 1995 opinion letter in which the agency concluded that an Oakar bank was not a formal member of SAIF for purposes of certain secondary statutes that levy additional charges against SAIF members. FDIC Gen. Counsel Op. No. 7, 60 Fed.Reg. 7055 (Feb. 6, 1995). But that opinion did not deal with the issue this case raises—whether Oakar banks should be treated as members of SAIF for purposes of downstream transactions. Wells Fargo lists a parade of horribles that it believes would occur if Oakar banks were deemed SAIF members for all purposes, but that is the import of neither the Rankin Letter nor the 1996 rulemaking. Instead, both treat Oakar banks as SAIF members only with regard to second-generation transactions. Given the unique hybrid nature of Oakar banks, we think it not at all unreasonable for the FDIC to conclude that they should be treated as SAIF members for purposes related to loss allocation and premium assessments, but not for others.

Because the most reasonable interpretation of sections 1815(d)(3) and 1817(*l*) treats Oakar banks as SAIF members during subsequent conversion transactions, we affirm.

*So ordered.*