# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued November 14, 2012        Decided March 8, 2013

No. 11-5317

MBIA INSURANCE CORPORATION,
APPELLANT

v.

FEDERAL DEPOSIT INSURANCE CORPORATION, IN ITS
CORPORATE CAPACITY AND AS CONSERVATOR AND RECEIVER
OF INDYMAC FEDERAL BANK, F.S.B.,
APPELLEE

Appeal from the United States District Court
for the District of Columbia
(No. 1:09-cv-01011)

*Howard R. Hawkins Jr.* argued the cause for appellant. With him on the briefs were *Jason Jurgens*, *David F. Williams*, and *Geoffrey Gettinger*.

*J. Scott Watson*, Counsel, Federal Deposit Insurance Corporation, argued the cause for appellee. With him on the brief were *Colleen J. Boles*, Assistant General Counsel, *Lawrence H. Richmond*, Senior Counsel, and *William R. Stein* and *Scott H. Christensen*. *Thomas L. Holzman* and *Daniel H. Kurtenbach*, Counsel, Federal Deposit Insurance Corporation, entered appearances.

Before:  HENDERSON and ROGERS, *Circuit Judges* and SENTELLE, *Senior Circuit Judge*.

Opinion for the Court by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*: The issue in this appeal is whether payments made by the MBIA Insurance Corporation ("MBIA") to investors in mortgage securitizations of a failed bank (IndyMac Bank, F.S.B.) constitute "administrative expenses" entitled to priority under the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), Pub. L. No. 101-73, 103 Stat. 183 (Aug. 9, 1989), 12 U.S.C. § 1821(d)(11)(A).  MBIA sued as the third party beneficiary of the Pooling and Servicing Agreements ("PSAs") of the failed bank.  It alleged that the Federal Deposit Insurance Corporation ("FDIC") as conservator of the successor bank had "approved," 12 U.S.C. § 1821(d)(20), the PSAs and then breached its "Put Back" obligations under those agreements, resulting in investor claims on MBIA-issued insurance policies.  The district court rejected MBIA's priority claim, and MBIA now contends that the district court erred in relying on a narrow definition of "approved" as requiring a written sanction when other broader dictionary definitions exist under which the FDIC Conservator arguably "approved" the PSAs when it executed the Purchase and Assumption Agreement ("P&A") and partially performed its servicing obligations pursuant to the PSAs.  For the following reasons, we affirm.

## I.

In the wake of IndyMac Bank's financial collapse, a new federally chartered bank, IndyMac Federal, assumed various contractual agreements to which the failed bank had been a party, including the three PSAs that are the basis for MBIA's claims.  According to MBIA, the FDIC Conservator of IndyMac

Federal breached its seller-and-servicer obligations under the PSAs, causing damages to MBIA. To assess MBIA's contention that its damages constitute "administrative expenses" entitled to priority under 12 U.S.C. § 1821(d)(11)(A) because the FDIC had "approved" the PSAs within the meaning of § 1821(d)(20), we set forth the relevant statutory framework before turning to MBIA's allegations, which, upon *de novo* review of the dismissal of MBIA's amended complaint, *see Barr v. Clinton*, 370 F.3d 1196, 1201 (D.C. Cir. 2004), we must accept as true, *Jerome Stevens Pharm., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005).

**A**.

FIRREA was enacted in 1989 in the wake of the savings and loan crisis "to enable the FDIC . . . to expeditiously wind up the affairs of literally hundreds of failed financial institutions throughout the country." *Freeman v. FDIC*, 56 F.3d 1394, 1398 (D.C. Cir. 1995). Congress authorized the takeover of failing federally regulated financial institutions, vesting authority in the FDIC as receiver to liquidate the remaining assets of the failed institution, *see* 12 U.S.C. § 1821(d)(2)(E), and as conservator to "carry on the business of the institution and preserve and conserve the assets and property," *see id.* § 1821(d)(2)(D)(ii). Upon appointment, the FDIC steps into the shoes of the failed institution and succeeds to "title to the books, records, and assets" of that entity, as well as to "all rights, titles, powers, and privileges" of the institution. *Id*. § 1821(d)(2)(A). In so doing it has "extraordinary powers," *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. City Sav., F.S.B.*, 28 F.3d 376, 388 (3d Cir. 1994), including authority to "disaffirm or repudiate any contract" of the failed institution that is "burdensome" and whose repudiation "will promote the orderly administration of the institution's affairs," subject to recovery of only "actual direct compensatory damages." *See* 12 U.S.C. § 1821(e)(1)-(3).

In addition, in 1993 Congress adopted the National Depositor Preference Amendment to the Federal Deposit Insurance Act. Pub. L. 103–66, § 3001(a), 107 Stat. 312, 336–37. This required, as relevant, that in the distribution of the assets of a failed institution depositors be paid before general creditors could collect on their claims.[1] As codified at 12 U.S.C. § 1821(d)(11), the depositor preference provision provides, in relevant part:

> amounts realized from the liquidation or other resolution of any insured depository institution by any receiver appointed for such institution shall be distributed to pay claims (other than secured claims to the extent of any such security) in the following order of priority:
>
> (i) Administrative expenses of the receiver.
> (ii) Any deposit liability of the institution.
> (iii) Any other general or senior liability of the institution (which is not a liability described in clause (iv) or (v)).
> (iv) Any obligation subordinated to depositors or general creditors . . . .
> (v) Any obligation to shareholders . . . .

*Id.* § 1821(d)(11)(A). Of particular relevance here, Congress also provided:

---

[1] Previously, depositors and general creditors of a failed bank had typically been treated to the same liquidation priority when claims against such an institution were being resolved. *See* James A. Marino & Rosalind L. Bennett, *The Consequences of National Depositor Preference*, 12 FDIC BANKING REV. 19, 22 (1999).

> Notwithstanding any other provision of this subsection, any final and unappealable judgment for monetary damages entered against a receiver or conservator for an insured depository institution for the breach of an agreement *executed or approved* by such receiver or conservator after the date of its appointment shall be paid as an administrative expense of the receiver or conservator. Nothing in this paragraph shall be construed to limit the power of a receiver or conservator to exercise any rights under contract or law, including to terminate, breach, cancel, or otherwise discontinue such agreement.

*Id.* § 1821(d)(20) (emphasis added). And if, pursuant to a contract for services of the failed institution, the conservator or receiver "accepts performance" before deciding to repudiate that contract, the payment to the counterparty under the contract for the services performed is "treated as an administrative expense of the conservatorship or receivership." *Id.* § 1821(e)(7)(B).

**B.**

According to MBIA's amended complaint, IndyMac Bank was heavily involved in the creation and promotion of residential mortgage loan securitizations prior to its insolvency in July 2008. Am. Compl. ¶¶ 23–25. Between 2002 and 2006, it sponsored residential mortgage securitizations valued at approximately $98.6 billion. *Id.* ¶ 24. To create a securitization, IndyMac Bank sold portfolios of mortgage loans to trusts managed by an outside banking institution, which, upon pooling the loans, would divide the cash flows from the pools and issue securities to investors. *Id.* ¶ 26. In order to increase marketability, lower interest costs, and mitigate risk to investors, many securitizations included the purchase of a financial

guaranty policy from an insurer, such as MBIA. *Id.* ¶ 29. Throughout 2006 and 2007, IndyMac Bank contracted with MBIA to provide financial guaranty insurance policies for the three IndyMac Bank securitization transactions at issue: INDS 2006-H4, INDS 2007-1, and INDS 2007-2. *Id. ¶ 32.* For each securitization, MBIA and IndyMac Bank entered into an Insurance and Indemnity Agreement, pursuant to which MBIA issued insurance policies guaranteeing investors in the securitized mortgages the promised cash flows in the event of defaults and other losses in the mortgage loans underlying the investors' securities. *Id.* ¶¶ 32, 36, 38. In addition to representations and warranties by IndyMac Bank regarding its underwriting guidelines and practices for the loans in the securitized mortgage pools, *id. ¶* 39, the Insurance and Indemnity Agreements incorporated by reference, for the benefit of MBIA, the representations and warranties contained in the PSAs for each securitization between IndyMac Bank and the trusts managed by the outside banking institution, thereby making MBIA a third-party beneficiary of the PSAs. *Id.* ¶¶ 40–44. Among other obligations, the PSAs set forth "Seller" and "Servicer" obligations of IndyMac Bank with respect to the loans upon which the securitizations were based, including a "Put Back" process.[2]

---

[2] As Seller of the mortgage loans, IndyMac Bank made representations and warranties about the quality and characteristics of the loans in the pools of mortgages it transferred to the trusts for use in securities. Am. Compl. ¶ 41; INDS 2007-1 PSA § 2.03, Schedule III, Feb. 1, 2007. Also as Seller, IndyMac Bank obligated itself to participate in a "Put Back" process, whereby the bank assumed ongoing responsibility for curing any discovered breach of its representations and warranties by replacing or repurchasing the affected mortgage loans. Am. Comp. ¶¶ 58–59; INDS 2007-1 PSA § 2.03. As Servicer, IndyMac Bank collected principal and interest payments from borrowers, Am. Compl. ¶¶ 27, 55; INDS 2007-1 PSA § 3.01-3.06, and provided other collection services in the event that

On July 11, 2008, the Office of Thrift Supervision ("OTS") appointed the FDIC to act as receiver for IndyMac Bank because it was "likely to be unable to pay its obligations or meet its depositors' demands in the normal course of business," "in an unsafe and unsound condition to transact business due to its lack of capital and its illiquid condition," and had "no reasonable prospect of becoming adequately capitalized." OTS Order No. 2008-24, *Pass-Through Receivership Of A Federal Savings Association Into A De Novo Federal Savings Association That is Placed Into Conservatorship With the FDIC*, July 11, 2008 at 2 ("OTS 2008 Order"); Am. Compl. ¶ 46. From the third quarter of 2007 to the first quarter of 2008, IndyMac Bank had suffered losses amounting to approximately $842 million and was projected to report another $354 million loss for the second quarter of 2008. OTS 2008 Order at 2. The OTS Director had determined that "OTS must act immediately in order to prevent the probable default of [IndyMac Bank]." *Id.* at 3. The OTS approved the FDIC's request for issuance of a new federal mutual savings association charter pursuant to 12 U.S.C. § 1821(d)(2)(F)(i) and authorized "the transfer of such assets and liabilities of [IndyMac Bank] to its successor as the FDIC has determined to be appropriate." *Id.* at 3–4. Until a Board of Directors was appointed or elected for the new institution, the OTS authorized the FDIC to exercise those powers as well. *See id.* at 4.

---

borrowers were delinquent or defaulted on their mortgage obligations, Am. Compl. ¶¶ 55–56; INDS 2007-1 PSA § 3.12. It also would remit the proceeds from the mortgage loans to the trust and receive servicing fees in consideration. Am. Compl. ¶ 57; INDS 2007-1 PSA § 3.15. As Servicer, IndyMac Bank was not responsible for curing defects in any representations and warranties made by IndyMac Bank as Seller. *Cf.* INDS 2007-1 PSA § 2.09.

To carry out its responsibilities, the FDIC, in its several capacities, executed a Purchase and Assumption Agreement ("P&A") on the date of its appointment. Among the contracts transferred to the successor institution organized by the FDIC, IndyMac Federal, were the PSAs for the three IndyMac Bank securitizations at issue. *See* P&A § 2.1(j)-(l). A "put" provision allowed IndyMac Federal to require the IndyMac Bank Receiver to reassume certain liabilities or assets upon request. *See id.* § 3.6. Any proceeds from a sale of IndyMac Federal's assets and liabilities that remained after satisfaction of all obligations arising from IndyMac Federal's operation were to be paid to the IndyMac Bank Receiver to use in paying remaining claims. *See id.* § 7.2. Section 13.5 of the P&A provided that "the obligations and statements of responsibilities" in the P&A "are for the *sole and exclusive benefit* of the Receiver, the Corporation and the Assuming Bank and for the benefit of no other Person." *Id.* § 13.5 (emphasis added).

By March 2009, the FDIC Conservator had wound up most of IndyMac Bank's affairs. It sold a substantial portion of IndyMac Federal's assets and transferred all deposits to a newly chartered federal savings bank — OneWest Bank; OneWest agreed to "purchase all deposits and approximately $20.7 billion [of IndyMac Federal's $23.5 billion] in assets at a discount of $4.7 billion." FDIC Press Release, *FDIC Closes Sale of IndyMac Federal Bank, Pasadena, California*, Mar. 19, 2009 ("FDIC 2009 Press Release"); Am. Compl. ¶ 70. As conservator the FDIC had exercised authority under the "put" provision to require the IndyMac Bank Receiver to reacquire "any rights, obligations, or liabilities whatsoever" (enumerated under the PSA) in connection with INDS 2007-1, as well as two other securitizations not at issue here. *See* Agreement to Evidence Put of Assets and Liabilities at 4–5 & Attachment A, Mar. 2009. This FDIC Receiver repudiated the PSA contracts as burdensome and not in the interests of the orderly

administration of IndyMac Bank's affairs. *See* FDIC Letter of Mar. 19, 2008 to Deutsche Bank National Trust Co. With the end of the FDIC conservatorship upon the sale to OneWest Bank, IndyMac Federal was placed in a FDIC receivership, which transferred IndyMac Federal's remaining assets to FDIC Corporate in satisfaction of certain obligations that arose in connection with IndyMac Federal. Am. Compl. ¶ 85.

On May 29, 2009, MBIA filed suit against IndyMac Bank and the FDIC as its receiver, alleging that MBIA had incurred "significant losses in connection with its obligations . . . to insure certain shortfalls in payments to investors in the IndyMac [Securitization] Transactions, all as a result of IndyMac's misrepresentations and misleading conduct." Compl. ¶ 49. MBIA also submitted in the FDIC administrative process proofs of claims on June 16, 2009 and August 25, 2009, based on alleged breaches of the representations and warranties in IndyMac Bank's PSAs and failure to honor the "Put Back" obligation. *See* Am. Compl. ¶¶ 12, 130.

On November 12, 2009, the FDIC Board of Directors made a "No Value Determination," finding that the receiverships for IndyMac Bank and IndyMac Federal had insufficient assets to cover their respective liabilities. *See* FDIC Resolution, Nov. 12, 2009 ("No Value Determination"). The receiverships thus would make no "distribution on general unsecured claims (and any lower priority claims)." *Id.* at 2. "[T]herefore all such claims, asserted or unasserted, will recover nothing and have no value." *Id.* MBIA was advised by letter on December 10, 2009 that no distribution would be made on its submitted proofs of claims, which the FDIC classified as general creditor claims.

On February 8, 2010, MBIA filed an amended complaint alleging that its damages arising from the breach of three

IndyMac Bank PSAs to which it was a third-party beneficiary constituted "administrative expenses" under § 1821(d)(11)(A) because the PSAs had been "approved" under § 1821(d)(20) by the FDIC Conservator. *Id.* ¶ 4. Specifically, the FDIC Conservator had "approved" the PSAs by entering into the P&A on behalf of IndyMac Federal, collecting servicing fees under the PSAs, partially performing its servicing obligations under the PSAs, and selling two of the three PSAs to OneWest Bank. *Id*. ¶¶ 60–62, 69. MBIA also asserted claims against FDIC Corporate based on the No Value Determination deeming MBIA's claims worthless general creditor claims, and on FDIC Corporate's allegedly wrongful receipt of the proceeds of IndyMac Federal's sale of assets, liabilities, and deposits to OneWest Bank.[3] *Id.* ¶¶ 182–193. MBIA sought declaratory and injunctive relief regarding the FDIC's purported repudiation of contracts related to INDS 2007-1, an IndyMac Bank securitization. *Id*. ¶¶ 40, 194–202.

The district court, upon finding that MBIA had failed to plead facts sufficient to demonstrate its monetary damages were entitled to priority as administrative expenses of the FDIC Conservator or Receiver, ruled that MBIA's damages claims are general creditor claims not entitled to administrative priority, granted the FDIC's motion to dismiss MBIA's claims as prudentially moot, and denied MBIA's other requests for relief. *MBIA Ins. Corp. v. FDIC*, 816 F. Supp. 2d 81 (D.D.C. 2011). MBIA appeals.

---

[3] In the district court MBIA counsel clarified that MBIA was seeking "administrative expenses" priority under FIRREA's administrative claims process and "[did]n't care what happened to the $1.5 [billion]" in proceeds that the FDIC obtained from the sale to OneWest Bank, and that its only alternative theory of recovery was based on 12 U.S.C. § 1821(m). *See* Tr. Sept. 27, 2011 at 40, 85.

**II.**

MBIA's contention that its damages claims, arising from payouts on insurance policies supporting three IndyMac Bank mortgage securitizations, constitute "administrative expenses" entitled to priority under 12 U.S.C. § 1821(d)(11)(A) presents a question of statutory interpretation. Although that provision does not define "administrative expenses," MBIA relies on § 1821(d)(20), which it contends is "clear on its face," MBIA Br. at 55, in maintaining that the FDIC Conservator plainly "approved" the underlying PSAs. Presumably because the FDIC has not promulgated a regulation or other policy defining "approved" for purposes of distribution under § 1821(d)(11)(A), it does not seek deference under *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984). *See United States v. Mead Corp.*, 533 U.S. 218, 226–27 (2001). With *Chevron* inapplicable, the court "must decide for [itself] the best reading." *Miller v. Clinton*, 687 F.3d 1332, 1342 (D.C. Cir. 2012) (internal quotation and citation omitted). In so doing, we will give the FDIC's views "the weight derived from their 'power to persuade.'" *Id.* at 1342 n.11 (quoting, *inter alia*, *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)); *see Wells Fargo Bank v. FDIC*, 310 F.3d 202, 208–09 (D.C. Cir. 2002).

We begin by examining whether the statutory text resolves whether "approved" requires a formal, written acknowledgment — as urged by the FDIC — or rather indicates that approval by implication from other conduct is sufficient, as MBIA urges. MBIA points to dictionary definitions that "approved" means simply "to consent or agree to" or "to ratify." MBIA Br. at 38 (citing RANDOM HOUSE WEBSTER'S UNABRIDGED DICTIONARY 103 (2d ed. 1998)). It also points out that, unlike in other subsections calling for approval by the

Corporation,[4] Congress did not prescribe formal procedures for a contract to be "approved" in § 1821(d)(20). Further, MBIA views FIRREA to establish "a binary scheme whereby contracts of a failed institution are either repudiated or not repudiated, and those that are not repudiated may be enforced by the FDIC." *Id.* at 42. In other words, "approved" is the equivalent of "non-repudiated" because, MBIA claims, invoking a statutory canon against redundancy, otherwise § 1821(e)(1)-(3), which authorizes the FDIC to repudiate contracts executed before appointment of a receiver or conservator, is redundant. "'Approved' contracts thus should include those that are assumed and not repudiated, like the PSAs." *Id.* at 42. After all, MBIA maintains, when § 1821(d)(20)'s use of "approved" is read in conjunction with § 1821(e)(7) on acceptance of services, it is clear that Congress wanted counterparties to be protected when they satisfied their contractual obligations.

---

[4] Section 1821(d)(10) provides, in relevant part:

> The receiver may, in the receiver's discretion and to the extent funds are available, pay creditor claims which are allowed by the receiver, *approved by the Corporation* pursuant to a final determination pursuant to paragraph (7) or (8), or determined by the final judgment of any court of competent jurisdiction in such manner and amounts as are authorized under this chapter.

12 U.S.C. § 1821(d)(10) (emphasis added). Section 1821(n) provides, in relevant part:

> The articles of association and organization certificate of a bridge bank *as approved by the Corporation* shall be executed by 3 representatives designated by the Corporation.

12 U.S.C § 1821(n)(1)(C) (emphasis added).

In contrast to MBIA's broad interpretation of § 1821(d)(20), the FDIC's view is that in that provision:

> Congress created a simple, bright-line rule. If counterparties wish to ensure that they receive administrative priority, they need to obtain written documentation: a contract "executed or approved" by FDIC after its appointment. This simple rule protects the receivership estate, depositors, contractual counterparties, and the courts from precisely the kind of disputes involved here.

FDIC Br. at 14. As to dictionary definitions, the FDIC responds that in the context of contract approval the dictionaries all say the same thing, namely that "approve" means to "confirm or sanction formally" or to "confirm authoritatively." *See id.* at 23 (citing RANDOM HOUSE WEBSTER'S UNABRIDGED DICTIONARY 103 (2d ed. 1998), WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 106 (2002), BLACK'S LAW DICTIONARY 118 (9th ed. 2009), and A NEW ENGLISH DICTIONARY ON HISTORICAL PRINCIPLES 416 (1st ed. 1888)). It emphasizes that its interpretation gathers meaning from the words around "approved." *See Jarecki v. G.D. Searle & Co.*, 367 U.S. 303, 307 (1961). Referencing the canon that words are known by their companions, *e.g., Gutierrez v. Ada*, 528 U.S. 250, 255 (2000), the FDIC observes that the word "execute" is narrow and does not include oral or other non-written actions, but requires a writing; "to execute means 'to complete and give validity to (a legal instrument) by fulfilling the legal requirements, as by signing or sealing.'" FDIC Br. at 24 (quoting RANDOM HOUSE WEBSTER'S UNABRIDGED DICTIONARY at 676). It follows, the FDIC suggests, that "approved" must be of similar limit, citing *Jarecki* where the Supreme Court applied the canon *noscitur a sociis* to limit the scope of the word "discovery," which is broad

viewed in isolation, to the common characteristic it shared with the adjacent words "exploration" and "prospecting," and therefore "discovery" was limited to "only the discovery of mineral resources." 367 U.S. at 307. Moreover, the FDIC observes, this court appears to have recognized that the lack of identification by Congress of the relevant format — here, a writing — may indicate latitude with regard to form but not with respect to the recording requirement generally. *Cf. Boulez v. Comm'r*, 810 F.2d 209, 216 n.51 (D.C. Cir. 1987).

MBIA replies that a list of two words is an inappropriate occasion for application of *noscitur a sociis*, citing to *Graham County Soil & Water Conservation District v. United States ex rel. Wilson*, 130 S. Ct. 1396, 1403 (2010), and *S.D. Warren Company v. Maine Board of Environmental Protection*, 547 U.S. 370, 378 (2006). Functionally, however, the FDIC points out that there would have been no point for Congress to use a narrow and precise term only to eliminate its usefulness and specificity by intending that "approved" be read more broadly and in a way that would make "executed" unnecessary or redundant. MBIA has no response. Also, the FDIC explains that its narrow interpretation does not read "executed" out of the statute as a subset of "approved," but gives each word its typical meaning: "executed" refers to the FDIC giving legal validity by signing a contract entered into by the *receiver* while "approved" refers to the FDIC giving legal validity to a contract previously entered into by the *failed bank*. MBIA agrees with this temporal analysis, but maintains that "[t]his distinction . . . is entirely consistent with MBIA's allegation that the FDIC 'approved' the PSAs" at issue. Reply Br. at 7.

The parties' dictionary references and interpretation of "executed or approved" suggest that MBIA's "clear on its face" claim fails, or at least does not resolve the precise question. Considering § 1821(d)(20) in the context of other provisions of

§ 1821 does, however, confirming that "approved" requires a formal, written sanction and cannot take the broad meaning urged by MBIA. In the only other instance where Congress provided for "administrative expenses" status in § 1821 — in § 1821(e)(7) — it used a narrow and circumscribed provision. Both parties cite *Russello v. United States*, 464 U.S. 16, 23 (1983), in support of their interpretations of "approved," but the FDIC points out that, in tying administrative priority to "acceptance" in § 1821(e)(7)(B)(ii), Congress indicated it meant something more specific by the word "approved" in § 1821(d)(20) than mere "acceptance" of a counterparty's performance. And having limited "acceptance" in § 1821(e)(7) to the acceptance of services performed for the FDIC after its appointment, Congress thereby demonstrated that it did not intend administrative priority to extend to claims based on other types of contractual obligations.

MBIA suggests that § 1821(e)(7) shows Congress intended that "the FDIC should not accept *benefits* from counterparties . . . without those counterparties being compensated ahead of depositors during the resolution process." MBIA Br. at 46 (emphasis added). But the plain text of § 1821(e)(7) shows the opposite; Congress did not confer administrative priority whenever the FDIC accepts "benefits" from counterparties, but rather limited the priority status to acceptance of "services performed" for the FDIC post-appointment. MBIA does not deny it provided no such services for the IndyMac Federal Conservator. So too, MBIA's reference to § 1821(n), *supra* note 4, regarding bridge banks and formal approval by the Corporation, does not address administrative expense priority much less demonstrate that § 1821(d)(20)'s "approved" is "clear on its face" in MBIA's favor; approval by the Corporation is what the FDIC's interpretation contemplates when the Corporation acts as conservator or receiver.

To the extent MBIA relies on the contract repudiation provisions of § 1821(e), it does not advance its cause. MBIA points to a comment in the legislative history of § 1821(e) that it was "closely modeled on parallel provisions of section 365 of the Bankruptcy Code" to support its argument that its reading of "approved" in the FIRREA context is correct. MBIA Br. at 52 (citing S. REP. NO. 101-19 at 314 (1989)). But a reading of the two sections shows they have little in common because Congress omitted from § 1821(e) key language in 11 U.S.C. § 365, whereby the trustee may "assume or reject executory contracts or [the] unexpired lease of the debtor," instead speaking only of the FDIC's authority to repudiate. *See RTC v. Diamond*, 18 F.3d 111, 122 (2d Cir. 1994), *vacated on other grounds*, 513 U.S. 801. The FDIC suggests, moreover, that the Bankruptcy Code does not have the need to "strengthen [the FDIC's] hand in remedying a national economic emergency," nor an overarching policy of protecting a class of depositors above all others and a corresponding need to cabin administrative expense. FDIC Br. at 41 (quoting *Diamond*, 18 F.3d at 123).

MBIA also maintains that the repudiation provisions would be unnecessary and ineffective if damages arising from the conservator's breach of an un-repudiated contract left a counterparty with only a general creditor claim. There is no reason to view these provisions as unnecessary even it they do not change the priority of damages, because the provisions serve to limit the damages available to a counterparty (by eliminating expectation and punitive damages). As the FDIC explains, expectation damages in contract cases are of particular concern to failed banks; for instance, repudiation protects the FDIC from paying damages for lost profits resulting from repudiated installment contracts. *See ALLTEL Info. Servs. v. FDIC*, 194 F.3d 1036, 1041 (9th Cir. 1999). Even assuming protections from expectation and punitive damages were as insignificant as MBIA suggests, which the FDIC emphasizes they are not, their

elimination constitutes the only consequences Congress attached to repudiation. *See* 12 U.S.C. § 1821(e)(3). Nothing in § 1821 provides that breaches of un-repudiated contracts have administrative priority. *Cf. Whitman v. Am. Trucking Ass'n*, 531 U.S. 457, 468 (2001).

Furthermore, a broad reading of "approved" would undermine Congress's stated purpose to prefer depositors over other creditors. Section 1821(d)(11) establishes an order of priority among claimants of the failed bank, placing recovery of "administrative expenses" first, followed by depositors' claims, and only thereafter general creditors' claims. MBIA's interpretation would put general creditors before depositors simply by virtue of the fact that the contracts to which they were a party or beneficiary were liabilities transferred to the FDIC Conservator by the commonly-used mechanism of a purchase and assumption agreement, *see* FDIC, RESOLUTIONS HANDBOOK 19 (2003), and were not repudiated. Specifically, MBIA's broad interpretation of "approved" would "plac[e] general creditor claims related to the *failed bank's pre-failure misrepresentations* above depositors," which "are hardly the types of claims that could ever be classified as administrative expenses." FDIC Br. at 35 (emphasis in original).[5] The FDIC regulation on "administrative expenses"[6] tracks Congress's

---

[5] The FDIC characterizes MBIA's lawsuit as an "attempt[] to push off onto FDIC responsibility for the losses MBIA sustained when the extreme risks it had knowingly assumed came home to roost and MBIA had to pay out on its insurance commitments." FDIC Br. at 1.

[6] The FDIC regulation instructs that the receiver's "administrative expenses" are "necessary expenses," 12 C.F.R. § 360.4 (2008), such as payment of the institution's last payroll, guard services, data processing services, utilities, and expenses related to leased facilities, but generally do not include severance pay claims or claims arising from contract repudiations, Receivership Rules, 60 Fed.

purpose that "administrative expenses" be a narrowly drawn category, limited to "ordinary and necessary expenses of the [failed] institution . . . but only those that the receiver determines are necessary to maintain services and facilities and to effect an orderly resolution of the institution." H.R. CONF. REP. NO. 103-213, at 436–37 (1993). Conservator duties are similarly circumscribed. *See* 12 U.S.C. § 1821(d)(2)(D). And the FDIC notes, when Congress enacted the National Depositor Preference Amendment it was part of a deficit reduction plan to reduce FDIC losses from bank failures. *See* FDIC, HISTORY OF THE EIGHTIES, LESSONS FOR THE FUTURE: AN EXAMINATION OF THE BANKING CRISES OF THE 1980S AND EARLY 1990S 90 (1997); *see also* H.R. CONF. REP. NO. 103-111, at 87–88 (1993) (stating amendment "would increase the amount of distribution to depositors of failed institutions" and increase FDIC recovery, thereby helping the Corporation to "realize a savings"). Even under the FDIC's narrow interpretation of "approved," the Federal Deposit Insurance Fund sustained a loss during IndyMac Federal's operation of about $10.7 billion. *See* FDIC 2009 Press Release.[7]

In sum, by means of a pass-through receivership and organization of a successor institution, continued banking services could be provided to IndyMac Bank's depositors while

---

Reg. 35,487-01, 35,487-1 (July 10, 1995). MBIA suggests the regulations provide a nonexclusive list; still they reflect a limited scope for "administrative expenses" that is consistent with the FDIC's narrow interpretation of § 1821(d)(20)'s "approved," a related provision. *Cf. Babbitt v. Sweet Home Chapter of Cmty. for a Great Oregon*, 515 U.S. 687, 698–703 (1995).

[7] During oral argument counsel for MBIA acknowledged that its breach of contract claims, which it contends constitute "administrative expenses" could amount to as much as five hundred million dollars. *See* Oral Arg. Tr. Nov. 14, 2012 at 13, 27.

a buyer was located for IndyMac Bank's assets and other property. Certain on-going contracts of the failed bank would continue for these purposes. But Congress distinguished, by its choice of words, between contracts merely "accepted" upon transfer or thereafter "non-repudiated" and contracts that qualified for "administrative expenses" priority under § 1821(d)(11)(A) because they had been "executed or approved" under § 1821(d)(20) by the FDIC after appointment. The context, where the FDIC steps into the shoes of a failed bank in emergency circumstances, shows in light of other provisions of § 1821 that Congress intended "approved" to have a formality consistent with "executed" and beyond "accept[ance]," and that a narrow meaning is required under the depositor preference scheme. A formal written sanction thus serves an important statutory purpose by limiting the contracts that are given priority. *Cf. Doe v. United States*, 372 F.3d 1347, 1359–61 (Fed. Cir. 2004). The FDIC's interpretation, unlike MBIA's, gives meaning to "approved" in the context of contract approval while treating § 1821 as a "symmetrical and coherent regulatory scheme," *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 121 (2000). Viewed in context, "approved" cannot bear the weight of MBIA's broad meaning, *see King v. St. Vincent's Hosp.*, 502 U.S. 215, 221 (1991), for Congress's "will has been expressed in reasonably plain terms," *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 570 (1982).

The FDIC has presented a careful contextual analysis of § 1821(d)(20) in light of the words Congress used in that provision and elsewhere in § 1821 and the purpose of the depositor preference distribution scheme, giving meaning to all provisions of § 1821. Unlike MBIA's approach, the FDIC's analysis neither renders "executed" and § 1821(e)(7) meaningless, nor frustrates the depositor preference goal in § 1821(d)(11) but best advances it. In the § 1821 context, we conclude that contract approval demands a formal determination of necessity by the FDIC Conservator or Receiver, *see* 12 U.S.C.

§ 1821(d)(2), and that a writing protects all interested parties, distinguishing "approved" contracts from on-going agreements assumed and non-repudiated. Under MBIA's broad interpretation of "approved," mere assumption, oral agreement, or partial performance would accord priority status to any damages stemming from a non-repudiated contract encompassed in the P&A as § 1821(d)(11)(A) "administrative expenses." Requiring a writing limits draws from the FDIC Insurance Fund for payment of "administrative expenses" in a manner consistent with the depositor preference distribution scheme. Section 1821(d)(20) is therefore best read as requiring formal, written approval by the FDIC to qualify contract damages for priority as "administrative expenses" under § 1821(d)(11)(A).

Our decision in *Wells Fargo*, 310 F.3d 202, reenforces our conclusion. In that case, the court concluded that "[a]t the very least" the FDIC was entitled to *Skidmore* deference for its interpretation of a different FIRREA provision because it was "charged with administering this highly detailed regulatory scheme." *Id.* at 208 (regarding 12 U.S.C. §§ 1815(d), 1817(*l*)). In according *Skidmore* deference, the court examined the purpose of the statutory scheme and concluded that the FDIC's interpretation was persuasive in part because contrary readings of the text "would frustrate Congress's . . . purpose" in enacting the provision "and would render the statutory scheme largely meaningless." *Id.* Here, as in *Wells Fargo*, interpreting § 1821(d)(20) in light of Congress's goals in enacting the depositor preference scheme clearly favors the FDIC's interpretation.

The district court therefore properly rejected MBIA's broad interpretation of "approved" in § 1821(d)(20) and dismissed MBIA's damages claims in counts I-V and VIII as prudentially moot in light of the FDIC's No Value Determination. *See MBIA Ins. Corp.*, 816 F. Supp. 2d at 101–02. "Where it is so unlikely that the court's grant of

[remedy] will actually relieve the injury," *Penthouse Int'l, Ltd. v. Meese*, 939 F.2d 1011, 1019 (D.C. Cir. 1991), the doctrine of prudential mootness permits the court in its discretion to "stay its hand, and to withhold relief it has the power to grant" by dismissing the claim for lack of subject matter jurisdiction, *Chamber of Commerce v. U.S. Dep't of Energy*, 627 F.2d 289, 291 (D.C. Cir. 1980). Absent a formal, written sanction by the FDIC of the PSAs for the three mortgage securitizations at issue, MBIA stands in the status of a general creditor under § 1821(d)(11). The No Value Determination forecloses the possibility of a real measure of redress for general creditors because the proceeds turned over to the FDIC receivers were insufficient to pay claims below the depositor class, *cf. FDIC v. Kooyomjian*, 220 F.3d 10, 15 (1st Cir. 2000); *Boone v. IndyMac Bank F.S.B.*, 2010 WL 7405439 (C.D. Cal. Dec. 14, 2010). MBIA does not contend that it could recover on its damages claims if it were treated as a general creditor, *see* Am. Compl. ¶ 12, and so a favorable judgment for MBIA on its contract breach claims cannot "provide a real measure of redress," *Foretich v. United States*, 351 F.3d 1198, 1216 (D.C. Cir. 2003), under § 1821(d)(11)'s despositor preference distribution scheme.

## III.

MBIA also contends that the district court erred in dismissing counts VI and VII for failure to state a claim. *See MBIA Ins. Corp.*, 816 F. Supp. 2d at 102–05. We affirm.

## A.

MBIA sought an injunction ordering FDIC Corporate to return any assets it received from the IndyMac Federal Receiver as a result of the sale of IndyMac Federal's assets to OneWest Bank. Maintaining that "[w]hatever payments were made by FDIC Receiver to FDIC Corporate . . . surely did not constitute 'dividends'" within the meaning of this statute, MBIA Br. at 65, MBIA alleged that the FDIC either "retained the $1.5 billion

paid by OneWest . . . and has since liquidated other assets, the proceeds from which it is holding in reserve to satisfy administrative expense claims" and erroneously refused to review MBIA's claims, or "transferred or otherwise dissipated the proceeds" from the sale without regard for these priority claims, Am. Compl. ¶¶ 188–89. Under either theory, MBIA insists, payment to FDIC Corporate was premature and therefore exceeded statutory authority. *Id.*

Section 1821(d)(10)(B) provides:

> The receiver may, in the receiver's sole discretion, pay *dividends on proved claims* at any time, and no liability shall attach to the Corporation (in such Corporation's corporate capacity or as receiver), by reason of any such payment, for failure to pay dividends to a claimant whose claim is not proved at the time of any such payment.

12 U.S. C. § 1821(d)(10) (emphasis added). MBIA agrees with the FDIC's definition of "dividend" as a payment to creditors of "any excess cash generated by the disposition of [a failed bank's] assets less disposition cost and reserves met," to be paid in accordance with the priority distribution scheme of § 1821(d)(11)(A). *See* MBIA Br. at 64 (quoting FDIC, *FDIC Dividends from Failed Banks*, *available at* http://www2.fdic.gov/divweb/index.asp). In urging that payment by the FDIC Receiver of IndyMac Federal to FDIC Corporate does not fall within this definition, MBIA relies principally on information about IndyMac Bank's dividend payments that it accessed from the FDIC's website. *See* MBIA Br. at 64. That information, however, is not part of the record properly before the court. *See* FED. R. APP. P. 10 (a) & (d). MBIA has not alleged in its amended complaint sufficient facts to determine that the IndyMac Federal Receiver paid FDIC

Corporate on the basis of unproven claims, or that such payment otherwise ought not to constitute a dividend payment. *See, e.g.*, Am. Compl. ¶¶ 85–87, 188–89. Absent such allegations, there was no basis for the district court to conclude that § 1821(d)(10)(B)'s preclusion of liability for the payment of dividends is inapplicable to the IndyMac Federal Receiver's distribution of funds to FDIC Corporate.

**B.**

MBIA also sought an injunction reversing the FDIC's denial of MBIA's claims against FDIC Corporate and the FDIC Receivers, and a declaratory judgment that the FDIC failed to repudiate the INDS 2007-1 PSA within a "reasonable period" as required by 12 U.S.C. § 1821(e)(2). *See* Am. Compl. ¶¶ 185–202. MBIA maintains that § 1821(j) poses no bar to this relief because, "[b]y its terms, § 1821(j) shields only the exercise of *powers or functions* Congress gave to the FDIC; the provision does not bar injunctive relief when the FDIC has acted or proposes to act beyond, or contrary to, its statutorily prescribed, constitutionally permitted, powers or functions." *Nat'l Trust for Hist. Pres. v. FDIC*, 995 F.2d 238, 240 (D.C. Cir. 1993), *aff'd on reh'g*, 21 F.3d 469, 471 (1994) (internal quotation omitted) (emphasis in original).

MBIA suggests that the FDIC acted beyond its statutory powers when: (1) the "FDIC Receiver ignored section 1821(d)(20) by not treating MBIA's claims as 'administrative expenses' during the claims process"; (2) the "FDIC Conservator did not properly dispose of the proceeds from the sale of assets to OneWest"; and (3) the "FDIC Receiver did not repudiate the INDS 2007-1 PSA in a reasonable time." MBIA Br. at 67. MBIA concedes, however, "[w]ith respect to the first two of these claims, to the extent liability arising from MBIA's damages claims constitutes 'administrative expenses,' then the FDIC's actions were *ultra vires*, and declaratory relief is appropriate." *Id.* These two grounds for injunctive claims are

therefore resolved on the merits by our holding that MBIA is not entitled to "administrative expenses" distribution priority. *See* Part II. MBIA's request for injunctive and declaratory relief based on untimely repudiation, in turn, is barred by 12 U.S.C. § 1821(j).

Section 1821(j) provides:

> Except as provided in this section, no court may take any action, except at the request of the Board of Directors by regulation or order, to restrain or affect the exercise of powers or functions of the Corporation as a conservator or a receiver.

12 U.S.C. § 1821(j). This court has acknowledged that Congress placed "drastic" restrictions on a court's ability to institute equitable remedies of the sort requested by MBIA, *see Freeman*, 56 F.3d at 1398–99, and has held that § 1821(j) bars equitable relief against the FDIC acting in its corporate capacity as well, *see Nat'l Trust*, 995 F.2d at 240.

The FDIC as conservator or receiver is authorized to "disaffirm or repudiate any contract or lease," 12 U.S.C. § 1821(e)(1), and therefore repudiation is properly viewed as a power of the Corporation operating in such capacities. *Cf. Nashville Lodging Co. v. RTC*, 59 F.3d 236, 241 (D.C. Cir. 1995). A court declaring a repudiation invalid would necessarily "restrain or affect the exercise" of this power by the FDIC and thereby contravene § 1821(j). Even assuming that the "reasonable time" clause in § 1821(e)(2) limits the repudiation power, MBIA alleges no facts to show that the FDIC's repudiation of the INDS 2007-1 PSA eight months after assuming the contract was not "within a reasonable period" in light of the financial crisis and the other circumstances that led to liquidation of IndyMac Bank's assets and liabilities.

**IV.**

Finally, as an alternative theory of recovery, MBIA contends that FDIC Corporate was obligated under 12 U.S.C. § 1821(m)(13) to fund IndyMac Federal's losses. Such losses, it asserts, include any "liability to MBIA arising out of FDIC Conservator's breaches of the PSAs."[8] MBIA Br. at 59. "Had FDIC Corporate satisfied its statutory obligation in section 1821(m)(13) to furnish funds to cover IndyMac Federal's losses during the period of the conservatorship," MBIA continues, "those additional funds would have been assets of the IndyMac Federal receivership and available for distribution to claimants like MBIA." *Id.* at 62. In sum, "[t]he district court's reliance on prudential mootness to dismiss MBIA's claims cannot be reconciled with FDIC Corporate's statutory obligation under section 1821(m)(11)-(13) to fund IndyMac Federal's losses, including its liability to MBIA arising out of FDIC Conservator's breaches of the PSAs." *Id.* at 59.

---

[8] Neither party has waived its contention on this issue. The district court analyzed MBIA's alternative theory of recovery on its merits. *See MBIA Ins. Corp.*, 816 F. Supp. 2d at 105–06. Although MBIA maintains that it "relied on FDIC's admissions" in the district court that § 1821(m) applied, *see* Reply Br. at 27, the district court transcript shows that the FDIC immediately objected that § 1821(m) had no relevance, *see* Tr. Sept. 27, 2011 at 73–74, and stated in moving to dismiss that it may have relied on other statutory mechanisms to establish IndyMac Federal, *see* Memorandum of Points and Authorities in Support of FDIC Receiver's Motion to Dismiss, at 7 (May 21, 2010). Moreover, the FDIC may "urge in support of a decree any matter appearing in the record, although [its] argument may involve an attack upon the reasoning of the lower court or an insistence upon matter overlooked or ignored by it" so long as doing so does not "modify the relief granted." *Freeman v. B&B Assoc.*, 790 F.2d 145, 150–51 (D.C. Cir. 1986) (citation omitted).

Section 1821(m) addresses when the FDIC "organize[s] a new national bank in the same community as the bank in default." 12 U.S.C. § 1821(m)(1). Under subpart (m) (11), the FDIC "shall promptly make available" to the new bank "an amount equal to the estimated insured deposits of such bank in default plus the estimated amount of the expenses of operating the new bank." *Id*. § 1821(m)(11)(A). Subpart (m)(12), in turn, requires "[e]arnings of the new bank" to be paid or credited to the Corporation. *Id.* § 1821(m)(12). Subpart (m)(13) provides:

> If any new bank, during the period it continues its status as such, sustains any losses with respect to which it is not effectively protected except by reason of being an insured bank, the Corporation shall furnish to it additional funds in the amount of such losses.

*Id.* § 1821(m)(13).

Section 1821(m) is inapplicable here. The OTS 2008 Order approved a charter for a successor bank pursuant to 12 U.S.C. § 1821(d)(2)(F)(i). *See* OTS 2008 Order at 3. That section states:

> The Corporation may, as receiver –
> (i) with respect to savings associations and by application to the [OTS] organize a new Federal savings association to take over such assets or such liabilities as the Corporation may determine to be appropriate.

12 U.S.C. § 1821(d)(2)(F)(i). The provision makes no reference to the obligations in § 1821(m), and MBIA points to nothing to suggest that "a new Federal savings association" organized pursuant to § 1821(d)(2)(F)(i) triggers FDIC Corporate's loss-funding obligation under § 1821(m). Additionally, the version

of the statute in effect when IndyMac Federal was created did not allow for the creation of a "new bank" as a means to resolve the affairs of a failed savings association like IndyMac Bank. The amendment allowing such creation did not take effect until July 30, 2008, weeks after the failure of IndyMac Bank.

Accordingly, we affirm the dismissal of MBIA's amended complaint.